Case 19.

PET. EQ.

## Manion's Admrs. *vs.* Titsworth.

APPEAL FROM BALLARD CIRCUIT.

1. An administrator who is appointed and qualified in another state, and removing to this state, may be sued here and compelled to account for assets received in another state. (*Dorsey's Exrs. vs. Dorsey's Admrs.* 5 *J. J. Marsh.* 230; *Atchison's heirs vs. Lindsey, &c.,* 6 *B. Monroe,* 86.)
2. The responsibility of an administrator appointed in another state is to be determined by the laws of the state where the qualification takes place.

3. If the purchase of slaves by an administrator be sanctioned by the constituted authority of the state where it takes place, and where administration was granted, it will *prima facie* be so treated in a suit against the administrator in Kentucky. (*Davis vs. Connelly's Exrs.* 4 *B. Monroe,* 364; *Greenleaf's Ev. vol.* 1, 550.)

4. Settlements of accounts by fiduciaries are *ex parte,* and are liable to be surcharged and re-examined by those interested.

5. One disability, as infancy and coverture, cannot be added to another to prevent the running of the statute of limitations. (*Finley & Wife vs. Patterson,* 2 *B. Monroe,* 78.)

6. Constructive trusts are not exempted from the operation of the statute of limitations, but the statute cannot avail against an express and direct trust. (*Talbot vs. Todd,* 5 *Dana,* 197; *Carter vs. Murray,* 3 *John. Chy. R.* 531; 16 *Sargent & Rawle,* 379.) And when the trust is openly denied the statute of limitations will apply. (*Bohannon's Hrs. vs. Streshley's Exrs.* 2 *B. Monroe,* 439; *Finley, &c., vs. Patterson, supra.*)

7. The husband may, during coverture, release or assign the wife's *choses in action,* and thereby defeat her right as survivor; but if the release be based upon an illegal consideration, or any part of it be illegal, it will not avail.

[The facts of the case are stated in the opinion of the court. Rep.]

*Tho. A. Marshall and James Harlan,* for appellant—

The executors of Manion resist the claim of appellees on four grounds: 1. That the title to the slaves in contest vested in Mrs. Cooper by her purchase, confirmed by the ordinary. 2. That the claim was released. 3. That this suit is carried on for the same illegal objects, and under the same illegal contract, as the first, and the dismissal of the former suit is pleaded and relied on as a bar to this suit. 4. That this suit is barred by lapse of time.

1. The detailed statement of the proceeding before the ordinary shows that the widow's purchase of the slaves was before the ordinary, and made the foundation of the charges and settlement, and sanctioned by that tribunal, and by the final division which was made between the widow and surviving daughter of the intestate, and was approved and confirmed, as far as the judgment of that court could confirm it; and the record showing his action in the premises is conclusive of his power to adjudicate up-

on all the questions arising out of the acts of the administrator. Comity requires of this court that it should regard the record and proceedings of a regularly constituted tribunal of a sister state as *prima facie* done in accordance with its jurisdiction, and is therefore *prima facie* evidence of the laws and usages which it exemplifies. The general principles applicable to this subject are recognized in *Davis vs. Connelly's ex'or* 4 *B. Monroe,* 136; *Rogers vs. Rogers,* 15 *B. Monroe,* 364, and are stated in *Greenleafs Ev.* 1 *vol. secs.* 547 *to* 550.

The decisions, judgments, or determinations of the ordinary in this case, must be considered *prima facie* acts within his jurisdiction, and correct until surcharged and shown to be otherwise.

It is not denied that an administrator who qualified in another State, bringing assets to Kentucky, may be compelled to distribute them to those entitled, as decided by this court in 6 *B. Monroe,* 86, *Atchinson's heirs vs. Lindsey, &c.* But neither the proposition itself, nor the decision of the court, give any sanction to the character and objects of this suit. It does not imply that the acts of the administrator are to be tested by the laws of this state, instead of the laws of the state where the administration was granted, and that accounts which have been there settled for years, by the regularly constituted tribunals of such state, are to be here overhauled in our courts, upon mere suggestion, without proof of illegality, and subjected to the tests of our laws, to which such administrator was not in any manner subject. This principle is recognized in the case of *Atchinson's heirs vs. Lindsey, &c., supra,* and *Davis vs. Connelly's ex'ors, supra.* The conclusion, therefore, must be, from the record, the sale of the negros by the administratrix, and her purchase of them was sanctioned by the laws of South Carolina, and that after the payment of debts the remainder was distributed according to the laws of South Carolina. The appellant relies upon the record of the ordinary as proving *prima fa-,*

*cie* that the acts of the administrator were done by his direction, or with his official approbation, and conformable to the laws of South Carolina, in force at the time, i. e., from 1823 to 1833, and are therefore *prima facie* evidence of what the law required or allowed.

It may be that the ordinary directed the sale of the slaves, and in such case the purchase, by their trustee, sanctioned, by the ordinary, forms as exception to the general rule that a trustee shall not purchase. (See *Hill on Trustee, side page* 539; 5 *Vez.* 881; 4 *Howard, U. S.* 555.) The fact that the widow, at the time of her purchase, was not then the acting administratrix, goes to relieve the act of purchase from the influence of the general rule which prohibits an administrator from purchasing at his own sale. Hill, in his treatise on trustees, *page* 159, says that in South Carolina there is an exception to the general restriction upon purchases by trustees, in the case of personality; and the case of *Stallings vs. Freeman*, 2 *Hill's Equity R.*; 8 *Alabama R.*, 680, is referred to. In these proceedings the slaves are referred to throughout as personality; and the case in 8 *Alabama R.*, shows that it arose out of a purchase of a slave in South Carolina by an administrator. The purchase of the slaves being a legal purchase, on her marriage they vested in her husband.

The only claim then which the daughter could have must be against her guardian, and not the administrator of her father; and that was released by her husband, who had full power to do so, if the release was founded on good consideration; but it is said that it was in part vicious. The evidence to prove that fact consists of loose statements of the party to whom it was given, and are not sufficient to establish the fact.

The statute of limitations is relied on, and, it is insisted, bars this suit, either for the slaves or the remnant of their value charged against the guardian. The slaves had been held adversely for more than

MANION'S ADMS *vs.* TITSWORTH.

ten years before this suit was brought against the plaintiff and her husband, whose right of action was perfect, and which he had a right to release and deprive his wife of any right of survivorship. The laches of the husband should operate as a release of the right which is barred, and deprive the wife of any right to maintain the action. But if these views be incorrect the statute presents a direct bar because, thirty years have elapsed since the adverse possession commenced on the plaintiff's mother, and twenty years since it commenced on Manion, and although the plaintiff was an infant at each of those periods, the statute allowed, on account of that disability, only five years from the time of its removal; and disability cannot be added to disability, to prolong the savings of the statute, the limitation began to run on attaining twenty-one, although then a married woman, and five years possession afterwards barred her right, as well as that of her husband.

*E. S. Worthington,* for appellee—

Mary Titsworth sued Manion's administrator for certain slaves and their hire, which were the property of her father, Adam Cooper, who died intestate in the state of South Carolina, leaving herself and another infant child, which died childless and unmarried in infancy, and their mother, his heirs at law. Her father probably died in the latter part of 1822, as administration was granted to her mother and George B. Cooper on the 6th of January, 1823. Manion married Mrs. Cooper, speedily qualified as guardian of her daughter, the appellee, and afterwards removed with them and the slaves in contest to Kentucky in 1838 or 1839. The petition also prays a settlement of the accounts of Manion as guardian for the appellee—there having been left a balance in money after paying Adam Cooper's debts, which came to the hands of said guardian.

The circuit judge, deeming the hire of Mrs. Titsworth's share of the slaves up to her marriage, Sep-

tember 2, 1841, about worth the expense of raising them and of her education, adjudged all accounts, up to that date, settled, and gave judgment for *one-third* of the slaves and their hire since that time. From this judgment, Manion's administrator appeals, and Mrs. Titsworth by cross appeal contends that it is for less than she is entitled to.

As Adam Cooper and the child which died were domiciled in South Carolina at the time of their death, and as the *situs* of the slaves in contest, so far as then in being, was also in that state at that time, the law of South Carolina fixes their descent or distribution, whether they are considered realty or personalty. (*Story on Confl. of Laws*, secs. 481–3; *Thomas vs. Tanner*, 6 *Mon.* 58; *Chapline vs. Moore*, 7 *Ib.* 175; *Fletcher vs. Wier*, 7 *Dana*, 348; *Barnes vs. Brashear*, 2 *B. Mon.* 381; *Adams vs. Adams*, 11 *B. Mon.* 78.) Whether an executor, administrator, or guardian can be sued in any other than a tribunal of the sovereignty from which his authority is derived, is a vexed question. (*Story on Confl. of Laws*, secs. 513–15; *Vaughan vs. Northup*, 15 *Peters* 1; *Fletcher vs. Wier*, 7 *Dana*, 348.) If such a fiduciary is not suable abroad in any case, a total failure of justice may ensue. Executors are often exonerated by the will from giving any surety; but even where they and other fiduciaries *do* give surety, the absence of principal or surety or both will preclude the possibility of a personal judgment, which can be enforced elsewhere, against one party or the other, or may be against both, because of the want of actual service of process. (*McNamara vs. Dwyer*, 7 *Paige*, 241.) Let that be as it may, the objection is one of jurisdiction, and was waived in this case under our Code by failing to object. We will proceed, then, to inquire what Mrs. Titsworth is entitled to.

The material parts of the statute of descents of South Carolina in force at the time of Adam Cooper's death and that of his child are as follows:

" 1st. If the intestate shall leave a widow and one
' or more children, the widow shall take one-third of
' the said estate, and the remainder shall be divided
' between the children, &c.

' 3rd. If the intestate shall not leave a child or other
' lineal descendant, but shall leave a widow and a
' father or mother, the widow shall be entitled to one
' moiety of the estate, and the father, or if he be
' dead, the mother, shall be entitled to the other
' moiety.

' 8th. If the intestate shall leave no widow, the
' provision made for her shall go as the rest of his
' estate is directed to be distributed in the respec-
' tive clauses in which the widow is provided for.

' II. *And be it further enacted*, That in all cases of
' intestacy the personal estate of the intestate shall
' be distributed in the same manner as real estates
' are disposed of by this act." (5 *Statutes at Large of
South Carolina*, 162.)

It will be noticed that, by virtue of the first clause
quoted, upon the death of Adam Cooper, one-third
of his estate, real and personal, descended to his
wife, and the other two-thirds to his two children.
It will be further noticed that, by virtue of the third
and eighth clauses, upon the death of the child which
died in infancy, the mother took its share, excluding
the surviving sister. To remedy this, an amendment
was passed in 1797 as follows:

" Whereas, it has been adjudged by the courts,
' upon the construction of the aforesaid act (that
' quoted from the act of 1791) that in cases in which
' persons die intestate, leaving no wife or children,
' or lineal descendant, but leaving father or mother,
' although such intestate shall also leave brothers and
' sisters, or brother and sister, or brothers or sisters,
' one or more, that the father or mother is entitled to
' receive the whole estate, *to the* exclusion of such
' other of his or her kindred aforesaid:

' I. *Be it therefore enacted*, *&c.* That from and after
' the passing of this act, in all cases in which any

' person shall die intestate leaving neither wife, child
' or children, or lineal descendant, but leaving a
' father or mother, and brothers and sisters, or brother
' and sister, or brothers or sisters, one or more, that
' the estate, real and personal, of such intestate, shall
' be equally divided amongst the father, or if he be
' dead, the mother, and such brothers and sisters as
' may be living at the time of the death of such intes-
' tate, so that such father or mother, as the case may
' be, and each brother and sister so left living by the
' intestate, shall each take an equal share of his es-
' tate, real and personal, &c." (5 *Statutes at Large of
South Carolina*, 304–5.)

Under the operation of this amendment, on the
death of the other child its property descended, one-
half to the mother and the other half to Mrs. Tits-
worth, thus giving to each one-half of Adam Coop-
er's estate. This amendment is not mentioned by
the circuit judge in his lucid and able opinion, and
we must probably attribute the judgment for *one-third*
of the slaves and their hire, instead of one-half, to
inadvertence. What *is* the half of Adam Cooper's
estate?

George B. Cooper seems to have received all the
cash realized at the sale of Adam Cooper's effects;
and upon final settlement, there remain in his hands
$40 63, which was paid over to the widow. The
latter bought property to the amount of $852 87,
which includes the slave then in being at $730. This
leaves in her hands $122 87, after subtracting the
slaves, on which is to be counted interest, as was
done on her account, for nine years and nine months
—$71 37, which added to the principal gives $194-
24. At this time, she received the balance from
George B. Cooper, viz: $40 63, making a total of
$234 87, with interest from Oct. 23, 1833. It is true,
she claimed a credit of $129 14 paid to Mary Cros-
by but that very debt was paid by George B. Cooper
and charged in his account as voucher 12, return 4.
In fact, Mrs. Manion returned no account. That

rendered is signed by her second husband, Manion. On the 20th of Oct. 1833, Manion gave bond as the guardian of his stepdaughter; and on the 25th, rendered an account of board, tuition, &c., running through eleven years, charging himself with $659 76 —one-half of Adam Cooper's estate after paying debts—as received for his ward. This account is the more shameless, because he had just married the child's mother, and of course *he* had neither boarded her nor paid her tuition fees. There is no good reason why Manion should not be charged with at least the sum of money above named, viz: $234 87, with interest from Oct. 23, 1833, less one-half, his wife's share. This releases him from any account of hire during his wife's widowhood, which might be charged. Parents are under a natural obligation to support their children, and will not be allowed therefor out of the children's estate, except where the distressed circumstances of the parents require it. (*Chapline vs. Moore*, 7 *Mon.* 173.) Such a state of case has not been shown as to Mrs. Manion, who deposes that she told Manion at the time of their marriage that she "had a right pretty little property." In fact, Mrs. Manion never set up any claim for supporting her child. Nor is any sufficient reason perceived for not charging Manion with hire prior to the marriage of Mrs. Titsworth, Sept. 2, 1841. Her mother swears that the child earned her vituals and clothes from the time of the mother's marriage with Manion up to the child's marriage, and it does not appear that any other expense on her account was incurred. It seems clear, then, that Mrs. Titsworth is entitled to a judgment for money, with interest from Oct. 23, 1833, and if she is entitled to any part of the slaves, that their hire ought to be computed from the same time. Let us examine her claim to the slaves.

We have already seen that, upon the death of Adam Cooper and the child which died, their property passed according to the law of South Carolina. That law was read by consent in the court below,

and by written agreement, filed in this court, is to
be read here. We have already quoted so much of the South Carolina statute as fixes the descent. But Mrs. Manion bought all the slaves then in being at her own sale as administratrix of Adam Cooper, and it is contended in behalf of Manion's administrator that she was thus vested with a complete right to the slaves, and that Mrs. Titsworth can claim nothing but an account of the sum for which they were bought.

Mrs. Manion swears that she bought and held the slaves for herself and children, and so told Manion before and after their marriage. She was, therefore, a trustee willing to execute the trust, and even if the trust was such that it would not be enforced against her, still any one claiming under or through her with notice of the trust, is bound by it. (*Martin vs. Martin*, 16 *B. Mon.* 186.) But it must be shown that an administratrix can make a valid purchase at her own sale in South Carolina. By the common law, such a purchase was denounced, and the property would still be held in trust for those concerned. (*Williams on Executors*, 674; *Hill on Trustees*, 159; *Ely vs. Horine*, 5 *Dana*, 404; *Moore vs. Monroe*, *Ibid*, 464; *Darcus vs. Crump*, 6 *B. Mon.* 365.) So in South Carolina. (*Edmunds vs. Crenshaw*, 1 *McCord's Chy.* 252; *Huson vs. Wallace*, 1 *Rich. Eq.* 7; *Lewis vs. Price*, 3 *Ib.* 172.) Lord Coke goes so far as to apply this doctrine to an executor who refuses to qualify. (*Williams on Executors*, 689.) The only statute of South Carolina touching this subject, is one forbidding executors and administrators to take any part of an estate at appraisement prices, and holding them liable for its true value. (3 *Statutes at Large*, 667.) The purchase of the slaves by the administratrix, therefore, enured to the benefit of her children as well as herself, and so they were held when she married. The right of Manion to the slaves, as against Mrs. Titsworth, is not only based on the supposition that all of them belonged to his wife, but

that, by his marriage, all right to them vested in him. What may be the marital rights of a husband in South Carolina to the slaves of his wife held absolutely and entirely as hers; whether they are chattels by the common law, or how far the act of 1790, (7 *Statutes at Large*, 344,) is still in force, making them assets for the payment of debts but declaring that they "shall be accounted as freehold in all other cases whatsoever, and descend accordingly"—we need not inquire; for it is settled by repeated decisions in South Carolina, that the marital rights of the husband to his wife's slaves, do not attach before a division. (*Durant vs. Salley*, 3 *Strobh. Eq.* 160, and cases cited; *Lewis vs. Price*, 3 *Rich. Eq.* 172.) The slaves were, then, still the property of Mrs. Titsworth and Mrs. Manion, even after the marriage of the latter; and the removal to Kentucky does not, *inter partes*, divest the right conferred by the law of South Carolina so as to give the husband, Manion, any right even to his wife's share. (*Beard vs. Basye*, 7 *B. Mon.* 141.) The contest is really between Mrs. Manion and her child. But Mrs. Manion makes no contest, and neither her husband nor his representatives can assert one for her.

But it is urged that the account of the administratrix was approved by the ordinary in South Carolina; that this approval is the judgment of a court of competent jurisdiction, and as such is binding until reversed by a direct proceeding of appeal; that the price bid for the slaves is included in that account; hence, that the purchase by the administratrix has been sanctioned by the proper court, and she was thereby invested with a perfect right, to the exclusion of her children; and so, even conceding that Manion has no right, it is apparent that Mrs. Titsworth has none, and therefore, cannot recover.

The law of South Carolina as to the accounts to be rendered by executors and administrators, is found in the 28th section of the act of 1789, (5 *Statutes at Large*, 112,) and is as follows:

"XXVIII. *And be it further enacted, &c.* That exec-
' utors or administrators shall annually, whilst the es-
' tate shall remain in their care or custody, at the first
' court to be held after the first day of January, ren-
' der to the court of the county or the ordinary of the
' district, as the case may be, from whom they ob-
' tained probate of will or letters of administration,
' a just and true account, upon oath, of the receipts
' and expenditures of such estate the preceding year,
' which when examined and approved, shall be de-
' posited with the inventory and appraisement, or
' other papers belonging to such estate, in the clerk's
' or ordinary's office, as the case may be, there to be
' kept for the inspection of such persons as may be
' interested in the said estate; and if any executor or
' administrator shall neglect to render such annual
' accounts, he shall not be entitled to any commis-
' sions for trouble in the management of the said es-
' tate, and shall moreover be liable to be sued for
' damages by any person or persons interested in such
' estate."

The action of the ordinary under this statute is
ministerial, not judicial, and the object is that the
accounts shall be always open "for the inspection of
such persons as may be interested." In all judicial
acts, there must be a *judex* or judge, *actor* or plaintiff,
and *reus* or defendant; and if either of these is want-
ing, the act is either not judicial, or is utterly void.
(3 *Bouv. Inst.* 132; *Story on Confl. of Laws, seco.* 586,
609.) The examination and approval of the ac-
counts of the administratrix of Adam Cooper was
without any citation of any party interested, and
hence is not a judgment at all. It is not regarded or
held to be a judgment in South Carolina. (*Neville vs.
Robinson,* 1 *Bailey,* 361; *Miller vs. Alexander,* 1 *Hill
Chy.* 25; *Lewis vs. Price,* 3 *Rich. Eq.* 173, *note A.*) It
will be observed that the account returned, is not re-
turned either under oath or by the administratrix,
but by her husband. Assuming that the approval of
the ordinary sanctions these apparent departures

from the requirements of law, still this judgment, if it is one, is now directly assailed as fraudulent, and as such may be disregarded. (*Story on Confl. of Laws, secs.* 597, 608.) .

As Mrs. Titsworth's right to one-half of the slaves was originally clear, we will look into the matters by which it is contended her right has been divested.

1. In 1845, Titsworth committed an assault on Manion for which he was sued. To get rid of this suit and of a prosecution for a felony involved in the assault, Titsworth agreed with Manion to release him from all liability as his wife's guardian. Even if this compromise embraced Mrs. Titsworth's claim to the slaves, it was fraudulent in itself and, as tending to obstruct justice, unlawful and corrupt. (*Gardner vs. Maxey,* 9 *B. Mon.* 90; *Swan vs. Chandler,* 8 *B. Mon.* 97.)

2. In the fall of 1850, Titsworth and wife executed some instrument to Thos. M. and B. B. Allcock, transferring the wife's interest in the slaves in contest. Suit was brought in the name of Titsworth and wife for the use of the Allcocks, which was dismissed, but as to Mrs. Titsworth without prejudice. This transaction and the judicial proceedings spoken of, are relied on as a bar to this suit.

What the instrument executed to the Allcocks was, this record does not disclose. We may safely say it was not a deed acknowledged and recorded. Since the married woman's law of 1846, a married woman's slaves could be conveyed only as lands are, (*Johnston vs. Jones,* 12 *B. Mon.* 329; *Johnston vs. Green,* 17 *Ib.* 123;) and consequently the sale to the Allcocks was a nullity as to Mrs. Titsworth, who could not be bound by anything like a title bond but only by deed duly acknowledged and recorded. (2 *Kent,* 168.) Whatever the instrument was, it is but too clearly proved that the unhappy wife was forced by a harsh and dissipated husband to sign it, and hence it does not bind her. The suit upon it was brought by the Allcocks, and it does not appear that Mrs.

Titsworth had anything to do with that suit. A bill in chancery is not evidence even against the complainant, (*Rees vs. Lawless*, 4 *Litt.* 219;) and surely Mrs. Titsworth is not to suffer for such a bill, where her name was used without her sanction. And the dismissal, still unreversed, expressly reserved her rights. Let us pass on.

3. Is the statute of limitations a bar?

It is impossible for a stepfather to assert successfully so monstrous a claim. He is, at least, in *loco parentis*, and it is his duty to protect and keep the property of his wife's child. It has been held by this court that such a possession by a father did not even make the property liable for his debts, or protect a purchaser from him. (*Kenningham vs. McLaughlin*, 3 *Mon.* 32; *Forsythe vs. Kreukbaum*, 7 *Ib.* 99.) Mrs. Titsworth was an infant when married, and became discovert only a few months before this suit was brought.

In conclusion, the able and learned opinion of the circuit judge is referred to as being unanswerable, except as to the errors against Mrs. Titsworth already noticed.

Upon the appeal, we ask that the judgment may be affirmed, and upon the cross appeal, that it may be reversed with directions to render judgment for one-half of the slaves and their hire from October 23, 1833, and for $167 43 with interest from the same time.

Judge SIMPSON delivered the opinion of the court.

Dec. 26, 1857.

Adam Cooper died intestate in the State of South Carolina in the year 1822. He left a widow and two infant children, one of whom afterwards died unmarried and in infancy. Administration on his estate was granted by the court of ordinary in the year 1823, to his widow and his brother George B. Cooper. Martin Manion afterwards intermarried with the widow, and in 1833 was appointed guardian of her infant daughter by the same court.

At the time of the grant of administration the court of ordinary entered an order authorizing a sale, by the administrators, of the personal estate of the intestate, at public auction. The intestate owned at the time of his death a female slave named Kate, and her two children. A sale of the personal estate, including these slaves, was made and reported to the ordinary shortly thereafter, by which it appeared that the slaves were purchased at the sale by the widow, at the price of $730. By subsequent proceedings in the court of ordinary, and settlements there made with the widow as administratrix, and George B. Cooper as administrator, of the estate, the sale of the slaves was recognized as valid, and the widow was charged with the price of them in her administration accounts.

Manion continued to reside in South Carolina until about the year 1838, when he removed to this state, bringing his ward along with him. In 1841, she being then about twenty years old, intermarried with George Titsworth, who afterwards died, and in 1853 this action was brought by her against the administrator of Martin Manion, who had died in the meantime, asserting a right to an interest in the slaves which had been purchased by her mother at the sale aforesaid, and their offspring, now fourteen or fifteen in number, on the ground that the purchase was invalid and did not confer any right on the purchaser, as she was one of the administrators; but that the slaves, notwithstanding the sale and purchase by her, still continued to be a part of her intestates estate, and as such the plaintiff was entitled to an interest therein.

The defendant denied the plaintiff's right to any interest in the slaves, and insisted that the purchase by the widow was legal and valid, and that upon her marriage with Manion the title thereto vested in her husband, who had ever since claimed and held them as his own. The defendant also relied upon the

lapse of time and the statute of limitations as a bar to the action.

It is the well settled doctrine in this state, that an administrator or executor who is appointed, or who qualifies in another state, and there receives assets into his hands, may be sued in the tribunals of this state, by the person or persons entitled to such assets, if he shall have removed to, and settled in this state. (*Dorsey's executor vs. Dorsey's admrs.* 5 *J. J. Marshall*, 230; *Atchison's heirs vs. Lindsey &c.* 6 *B. Mon.* 86.)

If therefore Manion held the slaves in contest in his fiduciary character either of guardian or administrator, his estate is not exempt from all responsibility in this action, on the ground that having received his appointment under the laws of South Carolina, and acquired the possession of the property in that state, he is only accountable to the tribunal which appointed him, that being the proper one to settle his accounts, and require distribution to be made of the assets in his hands, according to the laws of that state. But as he became a citizen and resident of this state, and the property claimed by the plaintiff was also here, there is no obstacle to a recovery by her, provided the other grounds of defense set up and relied upon by the defendant are insufficient to defeat her claim.

But although a foreign administrator, who has removed to this state, may be here required to account for the assets in his hands, to those who may be entitled to them, it does not follow that the mode of administration, or his liability as administrator, is to be tested by any other law than that of the state under whose authority his appointment was made. As the intestate was domiciled in South Carolina at the time of his death, and administration on his estate was granted there, the rights, powers, and duties of the administrator depend upon and are to be tested by the laws of that state.

The record from the ordinary's court in South Carolina is relied on to prove, *prima facie*, that the slaves

**Margin notes:**

MANION'S ADMS
*vs.*
TITSWORTH.

1. An administrator who is appointed and qualified in another state, and removing to this state, may be sued here and compelled to account for assets received in another state.— (*Dorsey's Exrs. v. Dorsey's adms.* 5 *J. J. Marsh.* 230; *Atchison's heirs vs. Lindsey, &c.* 6 *B.Mon.*86.)

2. The responsibility of an administrator appointed in another state is to be determined by the laws of the state where the qualification takes place.

3. If the purchase of slaves

MANION'S ARMS
vs.
TITSWORTH.

by an adminis-
trator be sanc-
tioned by the
constituted au-
thority of the
state where it
takes place, and
where administra-
tration was
granted, it will
*prima jacie* be so
treated in a suit
against the ad-
ministrator in
Kentucky. *(Da-
vis vs Connelly's
Exrs. 4 B Mon.
136; Greenleaf's
Ev. vol. 1, 550.)*

were rightfully sold, and that the purchase of them by the administratrix was legal and valid. The proceedings before the ordinary show that the widow's purchase of the slaves was reported to and sanctioned by that tribunal, and was conclusively approved and confirmed by it, so far as it had authority to do so, in a final settlement made by it in which the widow, as administratrix, was charged with the price of the slaves.

The record from the ordinary's court shows that the ordinary appoints administrators and appraisers, receives the appraisement and sale bills, orders a sale of the estate in the hands of the administrator, and settles his accounts. According to the decisions of this court the record of the proceedings of a regularly constituted tribunal of any of the states is itself *prima facie* evidence of its conformity to law, and of the authority of the tribunal to act judicially in the premises. The general principles applicable to this subject are laid down in *Davis vs. Connelly's executors*, 4 *B. Mon.* 136, and in *Rogers vs. Rogers*, 15 *B. Mon.* 364.

But it is contended that these principles have no application to the proceedings before the ordinary in South Carolina; that his action is ministerial, and not judicial, and that the examination and settlement of an administrator's accounts by him, not being a judgment between contesting parties, does not prove anything against the distributees of the estate. His court, however, is clearly a court of *probate* and *administration*, and a sentence or order of that court, upon matters properly within the jurisdiction of such a court, should be regarded as furnishing at least *prima facie* evidence not only of the authority of the court to act on the matters of which it has taken cognizance, but also that its action was in conformity with the law on that subject. (*Greenleaf's Evidence, vol.* 1, *sec.* 550.)

4 Settlements
of accounts by

Inasmuch, however, as the settlement of the accounts of fiduciaries, by a court of probate, is gene-

erally *ex parte*, it is justly subject to be re-examined, surcharged, and falsified. The principles upon which the settlement has proceeded, and which have been recognized by it as legal and correct, may be shown to be contrary to law, and wholly incorrect in their application.

MANION'S ADMS *vs.* TITSWORTH.

fiduciaries are *ex parte*, and are liable to be surcharged and re-examined by those interested.

It is conceded, that if the court of ordinary exceeded its powers in making the orders and settlements referred to, its acts are void for the want of jurisdiction. An effort was made to sustain this position, by reading, by consent of the parties, some of the statutes of South Carolina in relation to the duties of the ordinary. But none of the provisions of the statutes of that state which were so read, and to which we have been referred, can be construed as having the effect contended for.

As, however, the proceedings before the ordinary afford only *prima facie* evidence of the legality of the purchase of the slaves by the administratrix, it is insisted, that the statute of South Carolina, prohibiting the continuance of a usage by administrators, of taking the intestates personal property at the appraised value, and declaring that they should be held liable for the fair value thereof, shows the purchase to have been illegal and invalid. But the usage mentioned in this statute tends to prove that administrators were permitted, according to the laws of that state, to purchase personal property; for if they could not purchase it would have been wholly unnecessary to have prohibited them from taking it at the appraised value. The inevitable inference from this enactment is, that administrators were permitted to purchase such property, and that they had abused the privilege, by taking it at the appraised value, instead of purchasing it at a fair price at public auction, and the statute was passed to remedy this evil, and not to prohibit them from purchasing altogether. The right of the administrator to purchase the personal estate of his intestate, at a public sale made by himself, in the state of South Carolina,

is recognized in the case of *Stallings vs. Freeman*, reported in 2 *Hills Eq.* 401.

As the record furnishes *prima facie* evidence that slaves were personal estate in the state of South Carolina in 1823, when the purchase was made by the widow, and that an administrator was not prohibited by law from purchasing the slaves of his intestate, we cannot apply to this purchase the principles of the common law, by which such purchases are regarded as voidable, and the purchaser can be treated as a trustee by the injured parties. We might be permitted to do it, in the absence of all testimony in regard to the law of South Carolina on the subject, but having before us some evidence of what that law was at the time of the purchase, it became incumbent on the party attempting to assail the transaction to prove either that the purchase was prohibited by the law of that state or was fraudulent. No attempt has been made to establish either fact, nor has any effort been made to prove that the price at which the slaves were sold at the administrator's sale was not their full value. Consequently the title of the slaves vested in the widow by her purchase, and upon her intermarriage with Manion vested in him as her husband.

Besides, we are inclined to the opinion, if the purchase had been voidable under the rules and principles of the common law, that still the plaintiff's action would be barred by the lapse of time. The purchase was made more than thirty years before the action was commenced. Manion from the time of his marriage in 1832, until his death, claimed the slaves as his own, and did not admit that the plaintiff had any right to or interest in them. He never claimed or held them as her guardian, but in his own right. The manner in which he held and claimed them must have been known to her, and she could have maintained a suit against him for her interest in them at any time after he got possession of them.

If the fact that he was her guardian excused the failure to sue whilst she was an infant, during which time she was, independent of that circumstance, exempted by law from the operation of the statute of limitations, nevertheless she attained the age of twenty-one more than ten years before the commencement of this action; and the fact she was a married woman when her disability of infancy ceased did not prevent the application of the statute—it being well settled that one disability cannot be added to another, with the effect of defeating its operation. (*Findley and wife vs. Patterson*, 2 B. Monroe, 78.)

And as, even according to the principles of the common law, the purchase was not absolutely void, but the purchaser might have been regarded as the trustee of the infant, in consequence of her incapacity to purchase for her own benefit, still the trust would have been merely constructive, and not an express and direct trust, and consequently would not have been such a trust as is exempted from the operation of the statute, and cannot be affected by length of possession. (*Talbot vs. Todd*, 5 *Dana*, 199; *Coster vs. Murray*, 5 *John. C . R.* 531; 16 *Sarg & R.* 379.) And the trust having been openly denied, the statute of limitations would apply. (*Bohannon's heirs vs. Sthreshley's exors.* 2 B. Mon. 439, *and Findley &c. vs. Patterson, supra.*)

In this case there has been a long adverse holding, an open renunciation of the trust if one ever existed, and this was well known to the claimant. The purchase under which the slaves have been thus adversely held, was made more than thirty years before the commencement of the action. Under these circumstances a claim founded on an alleged invalidity of that purchase must be regarded as stale, and should, as we are inclined to think, be barred by the lapse of time. But it is not necessary to decide this question, inasmuch as the purchase must be regarded as legal, and as having under the laws of South

MANION'S ADMS
*vs.*
TITSWORTH.

5. One disability, as infancy and coverture, cannot be added to another to prevent the running of the statute of limitations. (*Finley & Wife vs. Patterson*, 2 B. Mon. 78.)

6. Constructive trusts are not exempted from the operation of the statute of limitations, but the statute cannot avail against an express and direct trust.— (*Talbot vs. Todd*, 5 *Dana*, 199; *Coster vs. Murray*, 3 *John Chy. R.* 531; 16 *Sargent & Rawle*, 379.) And when the trust is openly denied the statute of limitations will apply. (*Bohannon's Heirs vs. Streshley's Exrs.* 2 B. Mon. 439; *Finley, &c., vs. Patterson, supra.*)

Carolina, invested the purchaser with a valid title to the slaves.

But, although the plaintiff had no right to a judgment for any part of the slaves in contest, she was, in our opinion, entitled to some relief. Manion had acted as her guardian, and as such had in his hands, according to a settlement he made with the ordinary in 1833—before he removed to this state—the sum of $297 78, belonging to his ward. As, however, she continued to reside with him until her marriage in 1841, he should not be held responsible for interest upon the money in his hands during that time, but should account for interest upon it, only from the time of her marriage.

An effort has been made to impeach the settlement he made with the ordinary, on the ground that an allowance was made him for supporting his ward before he was appointed her guardian. But the allowance was not made to him, but to her mother as administratrix, and the object of the settlement was to ascertain the amount which was in his wife's hands as administratrix, for which he was to be charged as guardian. We do not perceive anything unreasonable or improper in that allowance.

7. The husband may, during coverture, release or assign the wife's *choses in action,* and thereby defeat her right as survivor; but if the release be based upon an illegal consideration,or any part of it be illegal, it will not avail.

It is, however, contended on the other side, that Manion in his lifetime obtained from George Titsworth, the plaintiff's husband, a release of any and every demand which he and his wife had against him as guardian; and a release to that effect has been set up and relied upon. There is no doubt but the husband may, by the execution of a release or an assignment of the wife's choses in action, during his lifetime, for a valuable consideration, defeat her right of survivorship in them. But it is insisted that the release in this case was given for an illegal consideration, and is therefore invalid; and such, from the testimony, appears to be the fact. Manion had sued Titsworth for an assault and battery, and threatened him with a criminal prosecution for wounding with an intent to kill, being the same injury for which he

had brought a civil action. A compromise was entered into by the parties, by which Manion agreed to dismiss his suit, and not to prosecute Titsworth for the wounding with intent to kill, and in consideration thereof the latter agreed to and did execute a release to the former, discharging him from all liability as guardian on account of the balance in his hands due to the latter in right of his wife. It is well settled that an agreement to compound a criminal prosecution is illegal, and every contract having such an agreement for its consideration is invalid and unobligatory. The fact that the dismissal of the action for the private injury constituted a part of the consideration is not sufficient to sustain the contract. Part of the consideration being illegal, the whole contract was thereby vitiated. Nor does it make any difference that Manion by dismissing his suit, in pursuance of the agreement between the parties, lost all redress for the personal injury he had sustained, and cannot be placed in *statu quo*, inasmuch as such loss resulted from his own illegal act in entering into an agreement which was expressly prohibited by law. It follows, therefore, that the release executed to Manion by Titsworth was illegal and invalid, and does not deprive the plaintiff of the right to recover in this action the money due her by her guardian.

Wherefore, the judgment is reversed, and cause remanded that a judgment may be rendered in favor of the plaintiff for the sum of $297 78, with interest thereon from the time she was married, and her costs.